# Exhibit A

to

**Notice of Removal**

*Sharma v. Aerwins Technologies, Inc., et al.*

Date Filed 2/29/2024 3:17 PM Case 1:24-cv-11446-PBS   Document 2-1   Filed 06/03/24   Page 2 of 21
Superior Court - Middlesex
Docket Number

1

**COMMONWEALTH OF MASSACHUSETTS**
**TRIAL COURT**
**SUPERIOR COURT CIVIL DIVISION**

**MIDDLESEX, ss**                        CIVIL ACTION NO. 24CV590

---

SIEGFRIED SHARMA,

     Plaintiff,

vs.                                              **COMPLAINT AND DEMAND FOR**
                                                 **JURY TRIAL**

AERWINS TECHONOLOGIES INC.; and
KIRAN SIDHU, in his individual capacity;
TAIJI ITO, in his individual capacity;           **RECEIVED**   2/29/24   tc
SHUHEI KOMATSU, in his individual
capacity.

     Defendants.

---

## I.    PARTIES

1.    Plaintiff, Siegfried Sharma (*hereinafter*, "Plaintiff"), is an individual who at all relevant

    times, resided at 18 Fairmont Terrace, Cambridge, Massachusetts 02148.

2.    AERWINS Technologies, Inc. (*hereinafter*, "AERWINS") is a corporation incorporated

    under the laws of the State of Delaware with a registered agent located at 1521 Concord

    Pike, Suite 201, Wilmington, Delaware 19803.

3.    Defendant Kiran Sidhu is an American citizen and was Chairman of the Board of

    AERWINS from May 15, 2023 to July 18, 2023. Since July 18, 2023, he is the Executive

    Chairman and President of AERWINS.

4.    Defendant Taiji Ito is a Japanese citizen and was Chief Executive Officer of AERWINS

    from March 20, 2023 to December 12, 2023.

5.     Defendant Shuhei Komatsu is a Japanese citizen and was Chief Executive Officer of
       AERWINS until March 20, 2023.

## II.    JURISDICTION AND VENUE

6.     Jurisdiction lies in this Court under M.G.L. c. 212, §3.

7.     Venue is proper under M.G.L. c. 223, § 1, since the acts or omissions which led to the
       Plaintiff's loss took place in Middlesex County.

8.     On July 31, 2023, Plaintiff filed a Complaint with the Massachusetts Attorney General's
       Fair Labor and Business Practices Division and the Attorney General's Office issue a
       letter granting Plaintiff the right to pursue a private action.

## III.    FACTS

9.     At all times relevant prior to March 20, 2023, Shuhei Komatsu (*hereinafter*, "Mr.
       Komatsu") was the Chief Executive Officer of AERWINS.

10.    At all times relevant after March 20, 2023, Taiji Ito (*hereinafter*, "Mr. Ito") was the
       Chief Executive Officer of AERWINS.

11.    At all times relevant after May 19, 2023, Kiran Sidhu (*hereinafter*, "Mr. Sidhu") was the
       Chairman of the Board of AERWINS. Upon information and belief, Mr. Sidhu
       participate in the management of AERWINS, including but not limited to the decision to
       lay off employees of AERWINS without paying unpaid wages. Mr. Sidhu is the current
       Chief Executive Officer of AERWINS.

12.    On or about January 1, 2023, the Plaintiff began working as a Director of AERWINS.

13.    Plaintiff received an annual salary of $120,000.

14.    Plaintiff's compensation package included $400,000 in annual stock compensation.

15.    A copy of the Plaintiff's employment contract is attached as Exhibit A.

16.    Plaintiff was never paid his salary.

17.  Plaintiff was terminated on June 26, 2023.

18.  Plaintiff was not compensated for his accrued vacation on the date of his termination.

19.  Plaintiff was not compensated for his travel expenses for the company.

20.  Plaintiff was not award any stock compensation.

**COUNT I**
**Violation of Massachusetts Wage Claim Act M.G.L. c. 149, § 148**
**Failure to Pay Wages**
***(All Defendants)***

21.  Plaintiff incorporates by reference the facts alleged in all preceding Paragraphs of this Complaint as if fully set forth herein.

22.  Any officer having management of a business is individually liable as the employer pursuant to M.G.L. c. 149, § 148.

23.  Defendants are required by Massachusetts General Laws to promptly pay any and all wages or remunerations.

24.  Defendants failed to pay all of Plaintiff's wages.

25.  As a result of the Defendants' failure to pay wages, the Plaintiff has suffered damages in an amount to be determined at trial.

**PLAINTIFF DEMANDS A TRIAL BY JURY.**

WHEREFORE, Plaintiff prays for the following:

1.  Pursuant to all Counts, an award of damages in an amount to be determined at trial together with interest;

2.  Pursuant to Count I, an award of multiple damages equal to three times the damages under the Massachusetts Wage Act M.G.L. c 149, § 148, M.G.L. c. 151, § 1, and M.G.L. c. 151, § 1A to be determined at trial;

3.  Pursuant to Counts I, an award of attorney's fees, interest, and costs under the Massachusetts Wage Act M.G.L. c 149, § 148, M.G.L. c. 151, § 1, and M.G.L. c. 151, § 1A; and

4.  For such other relief as this Honorable Court deems just and equitable.

Siegfried Sharma
Plaintiff by his attorney,

*/s/ John Koury*

_____

John B. Koury
BBO#:  694088
Upper Charles Law Group, LLC
81 Hartwell Ave., #101
Lexington, MA 02421
(617) 600.7150 | P
(781) 444.2461 | F
jkoury@uclawgroup.com

Date: February 29, 2024

4

# EXHIBIT A

Employment Agreement

Dated as of December 19, 2022

This Employee Employment Agreement (the "Agreement") dated as of the date first set forth above (the "Effective Date") is entered into by and between Pono Capital Corp., a Delaware corporation (the "Company") and SIEGFRIED SHARMA (the "Employee"). The Company and Employee may collective be referred to as the "Parties" and each individually as a "Party".

WHEREAS, the Company now desires to employ the Employee as the Director of the Company and the Employee desires to serve in such capacities on behalf of the Company, in each case subject to the terms and conditions herein;

NOW, THEREFORE, in consideration of the promises and of the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Company and the Employee hereby agree as follows:

1. Employment.

   (a) Term. The term of this Agreement (the "Term") shall begin as of the Effective Date and shall end date that this Agreement and the Term are terminated as set forth herein. Employee's employment with the Company shall be "at will," meaning that either Employee or the Company may terminate Employee's employment at any time and for any reason as set forth herein. Any contrary representations that may have been made to Employee are superseded by this Agreement.

   (b) Duties. The Company hereby appoints Employee, and Employee shall serve, as the Director of the Company and shall report to TAIJI ITO and the Board of Directors of the Company (the "Board") and to such other persons as designated by the TAIJI ITO or the Board. The Employee shall have such duties and responsibilities as are consistent with Employee's position with the Company. In addition, the Employee shall perform all other duties and accept all other responsibilities incident to such position as may reasonably be assigned to Employee by the Board.

2. Compensation and Other Benefits. As compensation for the services to be rendered hereunder, during the Term the Company shall pay to the Employee the salary and bonuses, and shall provide the benefits, as set forth in this Section 2.

   (a) Base Salary. The Company shall pay to the Employee an annual base salary of $120,000 payable on a monthly basis commencing on the Effective Date (as the same may be adjusted herein, the "Base Salary"). The Base Salary shall be paid in accordance with the Company's payroll policies.

   (b) Equity Issuances. The Employee shall be eligible to receive awards of options, restricted stock or other equity awards for shares of common stock, par value $0.000001 per share (the "Common Stock") of the Company (each, if so issued, an "Equity Award"), pursuant to award agreements in form and substance as determined by the Board and which will be entered into by and between the Company and Employee (if and when executed, each an "Award Agreement"). If

1

an Equity Award, if made, is subject to vesting, then such Equity Award shall be subject to vesting and forfeiture as set forth herein and in the applicable Award Agreement.

(c) Bonus. The Employee shall be eligible to receive any discretionary bonuses as determined by the Board.

(d) Fringe Benefits. During the Term, the Employee shall be entitled to fringe benefits consistent with the practices of the Company, and to the extent the Company provides similar benefits to the Company's non-executive employees.

(e) Business Trip. In the course of traveling for business matters, the Company shall reserve a Business Class seat for the Employee traveling by airplane.

3. Termination.

(a) Termination by the Company or Employee. The Company may terminate the Term and Employee's employment hereunder at any time. The Employee may terminate the Term and resign from Employee's employment hereunder at any time. In the event of any such termination either by the Company or Employee, any unvested portion of any equity granted to Executive hereunder or under any Award Agreement or any other agreements with the Company (collectively, the "Equity Grants") shall immediately be forfeited as of the termination date without any further action of the Parties, unless otherwise specifically set forth in an Award Agreement.

(b) Termination by Death or Disability. In the event of the Employee's death or total disability (as defined in Section 22(e)(3) of the Internal Revenue Code of 1986, as amended) during the Term, the Term and Employee's employment shall terminate on the date of death or total disability. In the event of such termination, the Company's sole obligations hereunder to the Employee (or the Employee's estate) shall be for unpaid Base Salary and accrued but unpaid bonus and benefits then owed or accrued, each of which shall be paid within 10 days following the date of the Employee's termination, and any unvested portion of any Equity Grants shall immediately be forfeited as of the termination date without any further action of the Parties.

(c) Conflict. In the event of a conflict between the terms and conditions herein and those in any other agreement or contract between the Company and the Employee with respect to any Equity Grants granted to Employee, the terms and conditions of such other agreement or contract shall control.

4. Post-Termination Assistance. Upon the Employee's termination of employment with the Company, the Employee agrees to fully cooperate in all matters relating to the winding up or pending work on behalf of the Company and the orderly transfer of work to other employees of the Company following any termination of the Employees' employment. The Employee further agrees that Employee will provide, upon reasonable notice, such information and assistance to the Company as may reasonably be requested by the Company in connection with any audit, governmental investigation, litigation, or other dispute in which the Company is or may become a party and as to which the Employee has

2

knowledge; provided, however, that (i) the Company agrees to reimburse the Employee for any related out-of-pocket expenses, including travel expenses, and (ii) any such assistance may not unreasonably interfere with Employee's then current employment.

5.  Confidentiality

(a) Definition. For purposes of this Agreement, "Confidential Information" shall mean all Company Work Product (as hereinafter defined) and all non-public written, electronic, and oral information or materials of Company communicated to or otherwise obtained by Employee in connection with this Agreement, which is related to the products, business and activities of Company, its Affiliates (as defined below), and subsidiaries, and their respective customers, clients, suppliers, and other entities with which such party does business, including: (i) all costing, pricing, technology, software, documentation, research, techniques, procedures, processes, discoveries, inventions, methodologies, data, tools, templates, know how, intellectual property and all other proprietary information of Company; (ii) the terms of this Agreement; and (iii) any other information identified as confidential in writing by Company. Confidential Information shall not include information that: (a) was lawfully known by Employee without an obligation of confidentiality before its receipt from Company; (b) is independently developed by Employee without reliance on or use of Confidential Information; (c) is or becomes publicly available without a breach by Employee of this Agreement; or (d) is disclosed to Employee by a third party which is not required to maintain its confidentiality. An "Affiliate" of a Party shall mean any entity directly or indirectly controlling, controlled by, or under common control with, such Party at any time during the Term for so long as such control exists.

(b) Company Ownership. Company shall retain all right, title, and interest to the Confidential Information, including all copies thereof and all rights to patents, copyrights, trademarks, trade secrets and other intellectual property rights inherent therein and appurtenant thereto. Subject to the terms and conditions of this Agreement, Company hereby grants Employee a non-exclusive, non-transferable, license during the Term to use any Confidential Information solely to the extent that such Confidential Information is necessary for the performance of Employee's duties hereunder. Employee shall not, by virtue of this Agreement or otherwise, acquire any proprietary rights whatsoever in Confidential Information, which shall be the sole and exclusive property and confidential information of Company. No identifying marks, copyright or proprietary right notices may be deleted from any copy of Confidential Information. Nothing contained herein shall be construed to limit the rights of Company from performing similar services for, or delivering the same or similar deliverable to, third parties using the Confidential Information and/or using the same personnel to provide any such services or deliverables.

(c) Confidentiality Obligations. Employee agrees to hold the Confidential Information in confidence and not to copy, reproduce, sell, assign, license, market, transfer, give or otherwise disclose such Confidential Information to any person or entity or to use the Confidential Information for any purposes whatsoever, without the express written permission of Company, other than disclosure to Employee's, partners, principals, directors, officers, employees, subcontractors and agents on a "need-to-know" basis as reasonably required for the performance of Employee's obligations hereunder or as otherwise agreed to herein. Employee shall be responsible to

3

Company for any violation of this Section 5 by Employee's employees, subcontractors, and agents. Employee shall maintain the Confidential Information with the same degree of care, but no less than a reasonable degree of care, as Employee employs concerning its own information of like kind and character.

(d) Required Disclosure. If Employee is requested to disclose any of the Confidential Information as part of an administrative or judicial proceeding, Employee shall, to the extent permitted by applicable law, promptly notify Company of that request and cooperate with Company, at Company's expense, in seeking a protective order or similar confidential treatment for the Confidential Information. If no protective order or other confidential treatment is obtained, Employee shall disclose only that portion of Confidential Information which is legally required and will exercise all reasonable efforts to obtain reliable assurances that confidential treatment will be accorded the Confidential Information which is required to be disclosed.

(e) Enforcement. Employee acknowledges that the Confidential Information is unique and valuable, and that remedies at law will be inadequate to protect Company from any actual or threatened breach of this Section 5 by Employee and that any such breach would cause irreparable and continuing injury to Company. Therefore, Employee agrees that Company shall be entitled to seek equitable relief with respect to the enforcement of this Section 5 without any requirement to post a bond, including, without limitation, injunction and specific performance, without proof of actual damages or exhausting other remedies, in addition to all other remedies available to Company at law or in equity. For greater clarity, in the event of a breach or threatened breach by Employee of any of the provisions of this Section 5, in addition to and not in limitation of any other rights, remedies or damages available at law or in equity, Company shall be entitled to a permanent injunction or other like remedy in order to prevent or restrain any such breach or threatened breach by Employee, and Employee agrees that an interim injunction may be granted against Employee immediately on the commencement of any action, claim, suit or proceeding by Company to enforce the provisions of this Section 5, and Employee further irrevocably consents to the granting of any such interim or permanent injunction or any like remedy. If any action at law or in equity is necessary to enforce the terms of this Section 5, Employee, if it is determined to be at fault, shall pay Company's reasonable legal fees and expenses on a substantial indemnity basis.

(f) Related Duties. Employee shall: (i) promptly deliver to Company upon Company's request all materials in Employee's possession which contain Confidential Information; (ii) use its best efforts to prevent any unauthorized use or disclosure of the Confidential Information; (iii) notify Company in writing immediately upon discovery of any such unauthorized use or disclosure; and (iv) cooperate in every reasonable way to regain possession of any Confidential Information and to prevent further unauthorized use and disclosure thereof.

(g) Legal Exceptions. Further notwithstanding the foregoing provisions of this Section 5, Employee may disclose confidential information as may be expressly required by law, governmental rule, regulation, executive order, court order, or in connection with a dispute between the Parties; provided that prior to making any such disclosure, subject to applicable law, Employee shall use its best efforts to: (i) provide Company with at least fifteen (15) days' prior written notice setting forth with specificity the

583605.v2

reason(s) for such disclosure, supporting documentation therefor, and the circumstances giving rise thereto; and (ii) limit the scope and duration of such disclosure to the strictest possible extent.

(h) Limitation. Except as specifically set forth herein, no licenses or rights under any patent, copyright, trademark, or trade secret are granted by Company to Employee hereunder, or are to be implied by this Agreement. Except for the restrictions on use and disclosure of Confidential Information imposed in this Agreement, no obligation of any kind is assumed or implied against either Party or their Affiliates by virtue of meetings or conversations between the Parties hereto with respect to the subject matter stated above or with respect to the exchange of Confidential Information. Each Party further acknowledges that this Agreement and any meetings and communications of the Parties and their affiliates relating to the same subject matter shall not: (i) constitute an offer, request, invitation or contract with the other Party to engage in any research, development or other work; (ii) constitute an offer, request, invitation or contract involving a buyer-seller relationship, joint venture, teaming or partnership relationship between the Parties and their affiliates; or (iii) constitute a representation, warranty, assurance, guarantee or inducement with respect to the accuracy or completeness of any Confidential Information or the non-infringement of the rights of third persons.

6. Intellectual Property Rights.

(a) Disclosure of Work Product. As used in this Agreement, the term "Work Product" means any invention, whether or not patentable, know-how, designs, mask works, trademarks, formulae, processes, manufacturing techniques, trade secrets, ideas, artwork, software or any copyrightable or patentable works. Employee agrees to disclose promptly in writing to Company, or any person designated by Company, all Work Product that is solely or jointly conceived, made, reduced to practice, or learned by Employee in the course of any work performed for Company ("Company Work Product"). Employee agrees (a) to use Employee's best efforts to maintain such Company Work Product in trust and strict confidence; (b) not to use Company Work Product in any manner or for any purpose not expressly set forth in this Agreement; and (c) not to disclose any such Company Work Product to any third party without first obtaining Company's express written consent on a case-by-case basis.

(b) Ownership of Company Work Product. Employee agrees that any and all Company Work Product conceived, written, created or first reduced to practice in the performance of work under this Agreement shall be deemed "work for hire" under applicable law and shall be the sole and exclusive property of Company.

(c) Assignment of Company Work Product. Employee irrevocably assigns to Company all right, title and interest worldwide in and to the Company Work Product and all applicable intellectual property rights related to the Company Work Product, including without limitation, copyrights, trademarks, trade secrets, patents, moral rights, contract and licensing rights (the "Proprietary Rights"). Except as set forth below, Employee retains no rights to use the Company Work Product and agrees not to challenge the validity of Company's ownership in the Company Work Product. Employee hereby grants to Company a perpetual, non-exclusive, fully paid-up, royalty-free, irrevocable and world-wide right, with rights to sublicense through

5

multiple tiers of sublicensees, to reproduce, make derivative works of, publicly perform, and display in any form or medium whether now known or later developed, distribute, make, use and sell any and all Employee owned or controlled Work Product or technology that Employee uses to complete the services and which is necessary for Company to use or exploit the Company Work Product.

(d) <u>Assistance.</u> Employee agrees to cooperate with Company or its designee(s), both during and after the Term, in the procurement and maintenance of Company's rights in Company Work Product and to execute, when requested, any other documents deemed necessary by Company to carry out the purpose of this Agreement. Employee will assist Company in every proper way to obtain, and from time to time enforce, United States and foreign Proprietary Rights relating to Company Work Product in any and all countries. Employee's obligation to assist Company with respect to Proprietary Rights relating to such Company Work Product in any and all countries shall continue beyond the termination of this Agreement, but Company shall compensate Employee at a reasonable rate to be mutually agreed upon after such termination for the time actually spent by Employee at Company's request on such assistance.

(e) <u>Execution of Documents.</u> In the event Company is unable for any reason, after reasonable effort, to secure Employee's signature on any document requested by Company pursuant to this Section 6 within seven (7) days of the Company's initial request to Employee, Employee hereby irrevocably designates and appoints Company and its duly authorized officers and agents as its agent and attorney in fact, which appointment is coupled with an interest, to act for and on its behalf solely to execute, verify and file any such documents and to do all other lawfully permitted acts to further the purposes of this Section 6 with the same legal force and effect as if executed by Employee. Employee hereby waives and quitclaims to Company any and all claims, of any nature whatsoever, which Employee now or may hereafter have for infringement of any Proprietary Rights assignable hereunder to Company.

(f) <u>Employee Representations and Warranties.</u> Employee hereby represents and warrants that: (i) Company Work Product will be an original work of Employee or all applicable third parties will have executed assignments of rights reasonably acceptable to Company; (ii) neither the Company Work Product nor any element thereof will infringe the intellectual property rights of any third party; (iii) neither the Company Work Product nor any element thereof will be subject to any restrictions or to any mortgages, liens, pledges, security interests, encumbrances or encroachments; (iv) Employee will not grant, directly or indirectly, any rights or interest whatsoever in the Company Work Product to any third party; (v) Employee has full right and power to enter into and perform Employee's obligations under this Agreement without the consent of any third party; (vi) Employee will use best efforts to prevent injury to any person (including employees of Company) or damage to property (including Company's property) during the Term; and (vii) should Company permit Employee to use any of Company's equipment, tools, or facilities during the Term, such permission shall be gratuitous and Employee shall be responsible for any injury to any person (including death) or damage to property (including Company's property) arising out of use of such equipment, tools or facilities.

583605.v2

7. <u>Representations and Warranties Relating to Securities.</u> The Equity Award, any shares of Common Stock or other securities of the Company that may be issued or granted to the Employee hereunder or pursuant to any other agreement between the Company and the Employee in connection with the transactions contemplated herein may be referred to as the "Securities", and Employee represents and warrants to the Company as set forth in this Section 7 with respect to the Securities and Employee's receipt thereof, as of the Effective Date and as of the date of any issuance or granting of any Securities.

(a) Employee hereby represent that the Securities awarded pursuant to this Agreement are being acquired for Employee's own account and not for sale or with a view to distribution thereof. Employee acknowledges and agrees that any sale or distribution of Securities which have vested may be made only pursuant to either (a) a registration statement on an appropriate form under the Securities Act of 1933, as amended (the "Securities Act"), which registration statement has become effective and is current with regard to the shares being sold, or (b) a specific exemption from the registration requirements of the Securities Act that is confirmed in a favorable written opinion of counsel, in form and substance satisfactory to counsel for the Company, prior to any such sale or distribution. Employee hereby consents to such action as the Board or the Company deems necessary or appropriate from time to time to prevent a violation of, or to perfect an exemption from, the registration requirements of the Securities Act or to implement the provisions of this Agreement, including but not limited to placing restrictive legends on certificates evidencing shares of Securities (whether or not the Restrictions applicable thereto have lapsed) and delivering stop transfer instructions to the Company's stock transfer agent.

(b) Employee understands that the Securities is being offered and sold to Employee in reliance upon specific exemptions from the registration requirements of United States federal and state securities laws and that the Company is relying upon the truth and accuracy of, and Employee's compliance with, the representations, warranties, agreements, acknowledgments and understandings of the Employee set forth herein in order to determine the availability of such exemptions and the eligibility of the Employee to acquire the Securities.

(c) Employee has been furnished with all documents and materials relating to the business, finances and operations of the Company and information that Employee requested and deemed material to making an informed investment decision regarding its acquisition of the Securities. Employee has been afforded the opportunity to review such documents and materials and the information contained therein. Employee has been afforded the opportunity to ask questions of the Company and its management. Employee understands that such discussions, as well as any written information provided by the Company, were intended to describe the aspects of the Company's business and prospects which the Company believes to be material, but were not necessarily a thorough or exhaustive description and the Company makes no representation or warranty with respect to the completeness of such information and makes no representation or warranty of any kind with respect to any information provided by any entity other than the Company. Some of such information may include projections as to the future performance of the Company, which projections may not be realized, may be based on assumptions which may not be correct and may be subject to numerous factors

583605.v2

beyond the Company's control. Additionally, Employee understands and represents that Employee is acquiring the Securities notwithstanding the fact that the Company may disclose in the future certain material information that the Employee has not received. Employee has sought such accounting, legal and tax advice as Employee has considered necessary to make an informed investment decision with respect to Employee's investment in the Securities. Employee has full power and authority to make the representations referred to herein, to acquire the Securities and to execute and deliver this Agreement. Employee, either personally, or together with Employee's advisors has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Securities, is able to bear the risks of an investment in the Securities and understands the risks of, and other considerations relating to, a purchase of the Securities. The Employee and Employee's advisors have had a reasonable opportunity to ask questions of and receive answers from the Company concerning the Securities. Employee's financial condition is such that Employee is able to bear the risk of holding the Securities that Employee may acquire pursuant to this Agreement for an indefinite period of time, and the risk of loss of Employee's entire investment in the Company. Employee has investigated the acquisition of the Securities to the extent Employee deemed necessary or desirable and the Company has provided Employee with any reasonable assistance Employee has requested in connection therewith. No representations or warranties have been made to Employee by the Company, or any representative of the Company, or any securities broker/dealer, other than as set forth in this Agreement.

(d) Employee also acknowledges and agrees that an investment in the Securities is highly speculative and involves a high degree of risk of loss of the entire investment in the Company and there is no assurance that a public market for the Securities will ever develop and that, as a result, Employee may not be able to liquidate Employee's investment in the Securities should a need arise to do so. Employee is not dependent for liquidity on any of the amounts Employee is investing in the Securities. Employee has full power and authority to make the representations referred to herein, to acquire the Securities and to execute and deliver this Agreement. Employee understands that the representations and warranties herein are to be relied upon by the Company as a basis for the exemptions from registration and qualification of the issuance and sale of the Securities under the federal and state securities laws and for other purposes.

(e) Employee understands that no United States federal or state agency or any other government or governmental agency has passed upon or made any recommendation or endorsement of the Securities.

(f) Employee understands that until such time as the Securities have been registered under the Securities Act or may be sold pursuant to Rule 144, Rule 144A under the Securities Act or Regulation S without any restriction as to the number of securities as of a particular date that can then be immediately sold, the Securities may bear a restrictive legend in substantially the following form (and a stop-transfer order may be placed against transfer of the certificates for such Securities):

"NEITHER THE ISSUANCE AND SALE OF THE SECURITIES

REPRESENTED BY THIS CERTIFICATE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THESE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144, RULE 144A OR REGULATION S UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES."

(g) This Agreement has been duly and validly authorized by Employee. This Agreement has been duly executed and delivered on behalf of Employee, and this Agreement constitutes a valid and binding agreement of Employee enforceable in accordance with its terms.

8. Effect of Waiver. The waiver by either Party of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach hereof. No waiver shall be valid unless in writing.

9. Assignment. No Party shall have any power or any right to assign or transfer, in whole or in part, this Agreement, or any of its rights or any of its obligations hereunder, including, without limitation, any right to pursue any claim for damages pursuant to this Agreement or the transactions contemplated herein, or to pursue any claim for any breach or default of this Agreement, or any right arising from the purported assignor's due performance of its obligations hereunder, without the prior written consent of the other Party and any such purported assignment in contravention of the provisions herein shall be null and void and of no force or effect, provided that, notwithstanding the foregoing, the Company may transfer, assign or delegate to any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company any of Company's rights, obligations or duties hereunder.

10. No Third-Party Rights. Except as expressly provided in this Agreement, this Agreement is intended solely for the benefit of the Parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person or entity other than the Parties hereto.

11. Entire Agreement; Effectiveness of Agreement. This Agreement, any Award Agreement and any other agreement entered into between the Company and Employee with respect to the issuance of any equity securities of the Company or other equity awards relating to the Company set forth the entire agreement of the Parties hereto and shall supersede any and all prior agreements and understandings concerning the Employee's employment by the Company. This Agreement may be changed only by a written document signed by the Employee and the Company.

583605.v2

9

12. <u>Survival</u>. The provisions of Section 3, Section 4, Section 5, Section 6, Section 7 and Section 10 through Section 23, inclusive, shall survive any termination or expiration of this Agreement, and provided that any expiration or termination of this Agreement shall not excuse a Party from compliance with, or fulfillment of, any obligations or conditions which arose prior to such expiration or termination.

13. <u>Severability</u>. If any one or more of the provisions, or portions of any provision, of the Agreement shall be held to be invalid, illegal or unenforceable, the validity, legality or enforceability of the remaining provisions or parts hereof shall not in any way be affected or impaired thereby.

14. <u>Governing Law and Waiver of Jury Trial</u>.

    (a) All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be determined, and this Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of Delaware, and for all purposes shall be construed in accordance with the laws of such state, without giving effect to the choice of law provisions of such state.

    (B) SUBJECT TO SECTION 16, EACH PARTY AGREES THAT ALL LEGAL PROCEEDINGS CONCERNING THIS AGREEMENT SHALL BE COMMENCED IN THE ~~TOKYO~~ DISTRICT COURTS, OR, SOLELY IN THE *of Massachusetts* EVENT THAT THE ~~TOKYO~~ DISTRICT COURTS ARE UNABLE OR UNWILLING TO ASSERT JURISDICTION WITH RESPECT TO THIS AGREEMENT OR THE ENFORCEMENT OF ANY JUDGEMENT HEREUNDER FOR ANY REASON, THEN IN THE STATE OR FEDERAL COURTS OF THE UNITED STATES WITH JURISDICTION IN PALM BEACH COUNTY, FLORIDA (AS APPLICABLE, THE "SELECTED COURTS"). EACH PARTY HERETO HEREBY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE SELECTED COURTS FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION HEREWITH OR WITH ANY TRANSACTION CONTEMPLATED HEREBY OR DISCUSSED HEREIN (INCLUDING WITH RESPECT TO THE ENFORCEMENT OF THE RIGHTS OF A PARTY UNDER THIS AGREEMENT), AND HEREBY IRREVOCABLY WAIVES, AND AGREES NOT TO ASSERT IN ANY SUIT, ACTION OR PROCEEDING, ANY CLAIM THAT IT IS NOT PERSONALLY SUBJECT TO THE JURISDICTION OF SUCH SELECTED COURTS, OR SUCH SELECTED COURTS ARE IMPROPER OR INCONVENIENT VENUE FOR SUCH PROCEEDING. EACH PARTY HEREBY IRREVOCABLY WAIVES PERSONAL SERVICE OF PROCESS AND CONSENTS TO PROCESS BEING SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING BY MAILING A COPY THEREOF VIA REGISTERED OR CERTIFIED MAIL OR OVERNIGHT DELIVERY (WITH EVIDENCE OF DELIVERY) TO SUCH PARTY AT THE ADDRESS IN EFFECT FOR NOTICES TO IT UNDER THIS AGREEMENT AND AGREES THAT SUCH SERVICE SHALL CONSTITUTE GOOD AND SUFFICIENT SERVICE OF PROCESS AND NOTICE THEREOF. NOTHING CONTAINED HEREIN SHALL BE DEEMED TO LIMIT IN ANY WAY ANY RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

(c) TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 14(c).

15. <u>Attorneys' Fees, etc.</u> If any Party shall commence an action or proceeding to enforce any provisions of this Agreement, then the prevailing Party in such action or proceeding shall be reimbursed by the other Party for its attorneys' fees and other costs and expenses incurred in the investigation, preparation and prosecution of such action or proceeding.

16. <u>Arbitration.</u> Any controversy, claim or dispute arising out of or relating to this Agreement or the Employee's employment by the Company, including, but not limited to, common law and statutory claims for discrimination, wrongful discharge, and unpaid wages, shall be resolved by arbitration in Tokyo, Japan pursuant to then-prevailing National Rules for the Resolution of Employment Disputes of the American Arbitration Association, provided that in the event that such rules may not be applied in Tokyo, Japan for any reason, then pursuant to arbitration rules as reasonably determined by the Company. The arbitration shall be conducted by three arbitrators, with one arbitrator selected by each Party and the third arbitrator selected by the two arbitrators so selected by the Parties. The arbitrators shall be bound to follow the applicable Agreement provisions in adjudicating the dispute. It is agreed by both Parties that the arbitrators' decision is final, and that no Party may take any action, judicial or administrative, to overturn such decision. The judgment rendered by the arbitrators may be entered in the Selected Courts. Subject to the provisions of Section 15, each Party will pay its own expenses of arbitration and the expenses of the arbitrators will be equally shared provided that, if in the opinion of the arbitrators any claim, defense, or argument raised in the arbitration was unreasonable, the arbitrators may assess all or part of the expenses of the other Party (including reasonable attorneys' fees) and of the arbitrators as the arbitrators deem appropriate. The arbitrators may not award either Party punitive or consequential damages.

17. <u>General Remedies.</u> Each Party acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the other Party, and thus each Party acknowledges that the remedy at law for a breach of its obligations under this Agreement will be inadequate and agrees, in the event of a breach or threatened breach by such Party of the provisions of this Agreement, that the other Party shall be entitled, in addition to all other available remedies at law or in equity, and in addition to the penalties assessable herein, to an injunction or injunctions restraining, preventing or curing any breach of this Agreement and to enforce specifically the terms and provisions hereof, without the necessity of showing economic loss and without any bond or other security being required.

18. <u>Expenses.</u>  Other than as specifically set forth herein, each of the Parties will bear their own respective expenses, including legal, accounting and professional fees, incurred in

583605.v2

connection with this Agreement and the transactions contemplated herein.

19. Notices. All notices and other communications hereunder shall be in writing and shall be given by hand delivery to the other Party, or by registered or certified mail, return receipt requested, postage prepaid, or by email with return receipt requested and received or nationally recognized overnight courier service, addressed as set forth below or to such other address as either Party shall have furnished to the other in writing in accordance herewith. All notices, requests, demands and other communications shall be deemed to have been duly given (i) when delivered by hand, if personally delivered, (ii) when delivered by courier or overnight mail, if delivered by commercial courier service or overnight mail, and (iii) on receipt of confirmed delivery, if sent by email.

If to the Company:

AERWINS Technologies Inc.
Attn: Shuhei Komatsu
600 N Broad Street, Suite 5 # 529
Middletown, Delaware 19709
Email: shuhei.komatsu@aerwins.us

If to Employee, to:

SIEGFRIED SHARMA
18 Fairmount Ter., Malden, MA 02148, USA
Email: siegfried.sharma@yahoo.de
         siegfried.sharma@alumni.harvard.edu

20. Headings. The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

21. Counsel. The Parties acknowledge and agree that legal counsel to the Company ("Counsel") has prepared this Agreement at the request of the Company, and that Counsel is not legal counsel to Employee individually. Each of the Parties acknowledges and agrees that they are aware of, and have consented to, the Counsel acting as legal counsel to the Company and preparing this Agreement, and that Counsel has advised each of the Parties to retain separate counsel to review the terms and conditions of this Agreement and the other documents to be delivered in connection herewith, and each Party has either waived such right freely or has otherwise sought such additional counsel as it has deemed necessary. Each of the Parties acknowledges and agrees that Counsel does not owe any duties to Employee in Employee's individual capacity in connection with this Agreement and the transactions contemplated herein. Each of the Parties hereby waives any conflict of interest which may apply with respect to Counsel's actions as set forth herein, and the Parties confirm that the Parties have previously negotiated the material terms of the agreements as set forth herein.

22. Rule of Construction. The general rule of construction for interpreting a contract, which provides that the provisions of a contract should be construed against the Party preparing the contract, is waived by the Parties hereto. Each Party acknowledges that such Party was represented by separate legal counsel in this matter who participated in the preparation of this Agreement or such Party had the opportunity to retain counsel to participate in the

12

preparation of this Agreement but elected not to do so.

23. <u>Execution in Counterparts, Electronic Transmission</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original. The signature of any Party which is transmitted by any reliable electronic means such as, but not limited to, a photocopy, electronically scanned or facsimile machine, for purposes hereof, is to be considered as an original signature, and the document transmitted is to be considered to have the same binding effect as an original signature or an original document.

*[Signatures appear on following page]*

583605.v2

13

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

AERWINS Technologies Inc.

By: _____
Name: Shuhei Komatsu
Title:   Chief Executive Officer

Employee: SIEGFRIED SHARMA

By: _____
Name: Siegfried Sharma

*Valid only in combination with the amendment signed by both parties, and until 02/28/23 unless otherwise stated in writing from by the Employee.

14

### Employment Agreement Amendment A

Dated as of December 27, 2022

This Employment Side Agreement (the "Amendment") is in reference to the Employment Agreement (the "Agreement") dated as of December 19, 2022 between Pono Capital Corp., a Delaware corporation (the "Company") and SIEGFRIED SHARMA (the "Employee" and dated as of the date first set forth in Agreement (the "Effective Date").

WHEREAS, the Employment Agreement is valid only in combination with this Amendment, and subject to the terms and conditions herein;

NOW, THEREFORE, in consideration of the promises and of the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Company and the Employee hereby agree as follows:

The Employee receives shares in the Company on a yearly basis with a market value of at least US$400,000 at the time of the yearly award.

Concerning the regulation of expenses for the working period at a workplace outside of Austria, such as Abu Dhabi, the Company will bear the following expenses:
- Reasonable hotels/housing
- Reasonable transportation costs or company car
- Reasonable allowance for expenses such as e.g. meals/board and sundries
- Home travel up to twice per month at the air travel standard stated in the Agreement or a reasonable allowance for personal/family travel and related expenses
- Reasonable accident and health insurance or reimbursement of such expenses

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

AERWINS Technologies Inc.

By: _____
Name:
Title:

Employee: SIEGFRIED SHARMA

By: _____
Name: Siegfried Sharma